ROTTENSTEINER et, Plaintiffs-Appellees, v. CLEVELAND COCA COLA BOTTLING CO., Defendant-Appellant.

Ohio Appeals, Eighth District, Cuyahoga County.

No. 20793.   Decided February 2, 1948.

Wm. J. Corrigan, Cleveland, for plaintiffs-appellees.
Stanley & Smoyer, Cleveland, for defendant-appellant.

**OPINION**

By MORGAN, J.

The plaintiffs are sixteen employees of the Cleveland Coca Cola Bottling Company of Cleveland, Ohio. They filed this action in the Municipal Court of Cleveland on September 19, 1946 to recover three cents per case on deliveries of Coca Cola to certain outlets in the City of Cleveland. Judgment was rendered the plaintiffs for $448.65 by the Municipal Court.

The plaintiffs are members of Beer & Beverage Drivers Union, Local 293. This Union on May 1, 1941, entered into a contract with the defendant which continued until May 1, 1944. A contract of a similar nature and containing the same provisions was signed by defendant and Union, Local 293 covering the period from May 1, 1944 to the filing of this action.

Paragraph 6 of both of said contracts provided for the hiring and payment of regular drivers. Paragraph 14 of each contract provided for payment to special drivers as follows:

"Special drivers shall be paid thirty-six Dollars ($36.00) per week for time as fixed above, plus returns on exactly the same basis as regular drivers on all retail outlets and home deliveries. No returns are to be paid on relay deliveries or supply loads to drivers on route except on special accounts approved by a committee of the Bottlers and of the Union."

Regular drivers are those who service definite routes who deliver Coca Cola to their customers and who in addition to the fixed wage receive three cents per case for return cases.

By the contract, special drivers were paid returns on exactly the same basis as regular drivers "on all retail outlets and home deliveries." The deliveries for which this action was based were those made to the Ball Park, Stadium, Arena, and other similar places where the orders were usually given by telephone and deliveries made in large quantities.

The question to be decided is whether these deliveries were made to 'retail outlets' within the meaning of Sec. 14 of said contracts.

The defendant maintains that these deliveries are known as 'drop deliveries' and were made to wholesale as distinguished from retail customers.

The said contracts disclose two provisions relating to 'wholesale and retail customers.' The provisions are the same in each contract. In the first contract they are sections 50 and 51, and in the second contract sections 48 and 49, and are as follows:

"50. It is further agreed by the Employer that all wholesale and retail customers shall be notified to the effect that empty cases shall be made ready for drivers, with all bottles arranged properly in said cases. This is for the purpose of saving the driver's time and is for the benefit of the industry as a whole.

51. It is further agreed by the Employer that all wholesale and retail customers shall be notified to the effect that all beverage orders must be ready for the drivers on their first time around."

We find no provision in either contract defining wholesale and retail customers or distinguishing between them.

It is the position of plaintiffs that the question here involved is covered by the contract. On the other hand, the defendant maintains that there has never been a meeting of the minds of the parties and therefore there should be no recovery.

Edward Davis was the first witness for the plaintiff. He testified that he was the secretary-treasurer of Local 293 and on the question at issue in this case he testified.

"Q. Now, have you had any negotiations personally with Mr. Woods on this question?

A. Yes, sir.

Q. You have?

A. Yes, sir.

Q. And when did those negotiations begin? About when?

A. They began way over in '39.

Q. Have you ever been able to reach an agreement with the Coca Cola Company on this point?

A. No, sir.

Q. I am speaking now about the payment of special drivers commissions on returns from places like the Arena and Ball Park and these things that are now being sued on, you have never been able to reach an agreement with the Coca Cola Company on that subject?

A. No, sir."

Mr. William T. Woods testified that he was the local manager of the Cleveland Coca Cola Bottling Company and that in 1941 the payment on return cases or commissions was discussed. He testified:

"I think we went back to our negotiations of 1941, when the commissions were discussed between Mr. Artwell, Mr. Davis and the committee and it was agreed at that time by Mr. Artwell and Mr. Davis and the committee that a committee would be appointed by the bottlers and Mr. Artwell to look into the matter of these commissions to be paid to special delivery men, and what places should be exempt."

"Q. Was that committee appointed?

A. No, it was not.

Q. Was anything ever done about it?

A. No, there was not.

Q. Was any agreement ever reached on it?

A. No, there was not.

Q. Has any agreement ever been reached on that point at any time since then?

A. No, sir."

Mr. Woods also testified that the first time in the negotiations that the Union made the claim that commissions be paid under the contract signed in 1941, was in 1945. He testified as follows:

"Q. And when that demand was made upon you, was the demand a demand for payment under the contract or was it a demand to include such a provision in the contract? Which was it?

\* \* \* \*

A. In 1945 it was under the provisions of the contract so interpreted by the Union representative.

Q. Now, prior to that time, had there ever been such a demand made on you before?

A. No, sir.

Q. And that was when, did you say?

A. 1945.

Q. About what time in 1945?

A. If I recall correctly, it was along in August, September, thereabouts."

John Corbley testified that he is the 'general route supervisor' of the Coca Cola Bottling Company. He also testified that Mr. Artwell for the Union stated that 'we would have to pay back to 1941. This conversation was in 1945 and it was the first time that any claim was made that any commissions were due under the contract signed in 1941 and 1944.

The principal witness for plaintiffs on the negotiations between the parties was Jack Artwell who was the president and business manager of Local 293. As to the time that any demand was made on defendant for the payment of these commissions, Mr. Artwell testified:

"About '44 or '45 I would say, when we got complaints from our men they hadn't been receiving commissions on these outlets and we discussed it and had a meeting and called Mr. Woods for an appointment and we met Mr. Corbley and Mr. Woods and I believe Mr. O'Neill and myself and Mr. Davis"

and then Mr. Artwell and Mr. Davis for the Union proposed a compromise which was not acceptable to the defendant company, and afterwards

"Mr. Woods and Mr. O'Neill and myself numerous times, would sit down and we went over these problems and we, never got anyplace so far as these commissions are concerned.. They are naturally still pending."

Mr. Artwell also testified:

"Q. Now Mr. Artwell, when was the first time that you. talked with Mr. Woods about the payment of these commissions on the Ball Park ? As I understood you to say it was in. '44 some time?

A. '44, '43, '45, in those years.

Q. Yes, and did Mr. Woods or his company ever agree to pay these things?

A. He never told us he would pay it.

Q. Did they ever at any time agree to pay commissions to, the Ball Park?

A. No, not to my knowledge.

Q. Not to your knowledge?

A. No.

Q. And you have had a good many conversations with these people on the subject haven't you?

A. Yes.

Q. As you state?

A. Yes.

Q. And never at any time did they ever agree to pay you a commission on these things?

A. No."

The last statement by Mr. Artwell to the effect that the company had not ever agreed to pay a commission, is, of course, directly contrary to the position of the plaintiffs in this case wherein they claim that defendants agreed to pay commissions in the contracts of 1941 and also of 1944.

The evidence for both the plaintiffs and the defendant is, that the demand of payment of commissions under the 1941 contract was not made before 1945 or possibly 1944, at least. three years after the contract of 1941 was made. During the period 1941-1945, the company had two strikes in neither of which was the claim of commissions advanced. The plaintiffs explain this fact by the fact that the country was at war during that period and the members of the Union had the right to elect what claims would be made cause of a strike.. If, however, Article 14 of the contract of 1941 provides for the

payment of commissions on this class of deliveries, the special drivers were as much entitled to those commissions as they were to their regular salaries. The question of the wages of Union members should have arisen on the first payment of wages after the contract of 1941 took effect. If the members of the Union understood that the contract provided the payment of these commissions it is difficult to imagine any good reason why four years should go by before a demand for the payment of the commissions would be made by the plaintiffs or by anyone in their behalf.

12 American Jurisprudence, 787, Sec. 249:

"In the determination of the meaning of an indefinite or ambiguous contract, the interpretation placed upon the contract by the parties themselves is to be considered by the court and is entitled to great, if not controlling influence in ascertaining their understanding of its terms. In fact the courts will generally follow such practical interpretation of a doubtful contract. * * * Parties are far less likely to have been mistaken as to the meaning of their contract during the period when they are in harmony and practical interpretation reflects that meaning than when subsequent differences have impelled them to resort to law and one of them then seeks an interpretation at variance with their practical interpretations of its provisions."

**Courtright v Scrimger, 110 Oh St 547, syllabus 2:**

"Where words used in a contract are susceptible of more than one meaning, and the signatories to the contract have by acts done in carrying out the terms thereof placed their own interpretation upon the meaning of the words, courts will adopt the interpretation which the signatories to the contract have themselves made."

It is our opinion that in view of the ambiguity in the contract as to the meaning of the words 'retail outlets' and 'wholesale and retail customers' appearing in the contract, the failure of the plaintiffs and of Union, Local 293, to make any claim for commissions for return cases on deliveries to customers like the Ball Park, Stadium, Arena, etc., for four years after the contract was executed, presents a case where

the parties, both plaintiffs and the defendant, have placed their own construction upon the contract which is controlling.

The judgment is reversed and cause remanded for further proceedings according to law. Exc. O. S. J.

HURD, PJ, SKEEL, J, concur.